COMMERCIAL CASUALTY INSURANCE COMPANY et al.,
complainants,

*v.*

SOUTHERN SURETY COMPANY OF DES MOINES, IOWA,
defendant.

[Decided June 12th, 1931.]

*Messrs. McCarter & English,* for the complainants.

*Messrs. Lum, Tamblyn & Colyer,* for the defendant.

BACKES, V. C.

In February, 1924, the Southern Surety Company gave
its bond to the county of Allegheny, Pennsylvania, for
$1,100,000, insuring county funds on deposit with the Car-
negie Trust Company during the four-year term of the then
recently elected county treasurer. The Southern reinsured
the risk with nineteen other companies for $1,000,000, retain-
ing a liability of $100,000. The Commercial Casualty Com-
pany and the New Jersey Fidelity and Plate Glass Insurance
Company were two of the reinsurers; each for $50,000. The
trust company failed in April, 1925, and, upon paying the
loss, the Southern brought suits at law against the Com-
mercial and the Fidelity for the reinsurance. Thereupon this
bill was filed to restrain the suits and to cancel the reinsur-
ance agreements on the ground of fraud. A preliminary
injunction issued. *Commercial Casualty Insurance Co.* v.
*Southern Surety Co., 100 N. J. Eq. 92; affirmed, 101 N. J.
Eq. 738.*

The Southern, previously, in 1920, had given a bond for $1,400,000, insuring the county funds on deposit with the trust company during the term of the then county treasurer which expired in January, 1924. That risk was also reinsured. When the trust company, in February, 1924, applied to the Southern for a new bond of $1,400,000, John A. Bell, its president, agreed in writing to indemnify the Southern against loss. The bond was written for $1,100,000 because the Southern was unable to obtain more than $1,000,000 reinsurance, and itself was unwilling to carry more than a retained liability of $100,000 and an additional $50,000 insurance of another county fund on deposit with the trust company. Mr. Swinggi, the manager of the Pittsburgh branch of the Southern, negotiated the bond and the reinsurance.

The allegations of fraud are, that Zwinggi represented to Mr. Short, manager of the depository bond department of the Commercial, that:

"(a) The defendant was about to execute a bond as surety for Carnegie Trust Company to the county of Allegheny, in the sum of $1,400,000 to secure the deposit of funds of that county in the said trust company;

"(b) The defendant would itself retain at its own risk a liability on the said bond of at least $150,000;

"(c) The said bond was an original bond and not the renewal of a prior bond;

"(d) The said Carnegie Trust Company was then a solvent and well-managed institution;

"(e) John A. Bell, the defendant's indemnitor with respect to the said surety bond, was then worth at least $1,400,000;

"(f) The said John A. Bell was known by the said Zwinggi to be a man worth far in excess of $1,400,000 and not less than $10,000,000 or $11,000,000;

"(g) The fact of the solvency and good management of the Carnegie Trust Company and the wealth of the indemnitor, Bell, would lessen the risk of the proposed reinsurers."

That Short repeated the representations to the Fidelity at Zwinggi's request, to induce it to participate in the rein-

surance. The charges are, that the representations except (g) were untrue in fact, and all of those untrue in fact except "d" and "e" were untrue to the knowledge of Zwinggi, and were made with intent to induce the complainants to enter into the contracts of reinsurance; that they were material to the risk assumed by the complainants and were relied upon by them in entering into the contracts of reinsurance. At the hearing "a" and "b" were abandoned, and "g," a corollary, was not pressed.

This is the case as developed at the hearing: Zwinggi was in New York seeking reinsurance and accidentally met Mr. Campbell, the general agent of the Commercial at Pittsburgh, and told him of his errand. Campbell agreed to submit the proposition to his company, telephoned and then went to its main office in Newark and took Short back to the Waldorf where he had a dinner engagement with Zwinggi. He introduced them, but says he heard none of their conversation. Short says of the meeting:

"Mr. Zwinggi offered the financial statement of the bank, represented the bank to me as a first-class institution, well-managed, and he also said that we had the indemnity of a man by the name of John A. Bell, who was reputed to be worth in the neighborhood, net worth, of eleven or twelve million dollars. He further stated that Mr. Bell was, as I recall, a coal baron and banker—man of considerable wealth in that locality."

And being asked what else, he replied:

"Why, he just——he submitted the financial statement of the bank and financial statement of Bell, showing his worth and so forth, and told me that the bank was well-managed and financially sound and so forth."

And on cross-examination he added:

"He [Zwinggi] said, 'now, this is a large bond,' and, he says, 'we have the indemnity of the president, Mr. John A. Bell,' he says, 'Mr. Bell is a very wealthy man, a banker,' and something as I recall it, he said, 'a coal baron here in Pennsylvania;' and he also showed me the personal statement of Mr. Bell which showed, as I recall now, above all his

liabilities, about a net worth of eleven or twelve million dollars."

Asked if Zwinggi said anything about its being a renewal or original bond, he answered:

"It was a new bond, as I recall, sir, I am rather certain as to that, sir. It was a new bond covering county funds."

This is substantially all of Short's testimony as to representations. It will be observed that Short does not say that Zwinggi represented that Bell "was then worth at least $1,400,000," or that Bell "was known by the said Zwinggi to be a man worth far in excess of $1,400,000 and not less than $10,000,000 or $11,000,000," as alleged in "e" and "f," but that Bell was *reputed* to be worth ten or eleven million dollars. That he was so reputed is not controverted.

Zwinggi's version is quite different. He says that before he set out from Pittsburgh to canvass the trade he made up numerous sets of credentials, consisting of the trust company's application for a $1,400,000 bond and its financial statement; Bell's indemnity agreement; the Jones Mercantile Agency report and R. G. Dun's report on Bell, and a list of Bell's directorships; that when he met Campbell he gave him an outline, told him of the old bond and the reason for the new one and furnished him with a set of credentials to take to his company, and that when he met Campbell and Short in the evening, Short simply announced that his company would take $50,000, and that he replied he thought it was a safe risk. Later, in the course of conversation, he says Short suggested the Fidelity as a prospect; that he gave him a set of the credentials for that concern upon Short agreeing to submit the matter and to solicit its co-operation. Zwinggi's attitude is, that all his advances to the Commercial were made to its Pittsburgh general agent, Campbell, who, he says, was as familiar with the standing of the trust company and of Bell as he was, and that when Short met him in the evening and announced his company's action, there was no call for any further representations and that he made none. Campbell does not deny that Zwinggi told him of the old bond and the reason for the new one; he says he cannot recall. He

admits that he discussed the risk with Short over the telephone before going to Newark, but asserts he did not take a set of credentials with him; that he did not lay the matter before Short, though he went to Newark with that in mind, and that he did nothing more than to refer Short to Zwinggi. And Short says that he did not get a set of credentials from Campbell, and yet, a set, not otherwise accounted for, was produced at the hearing from the files of the Commercial. The most natural thing for Zwinggi to have done would have to give a set to Campbell as his "talking papers," and for Campbell to have unfolded the proposal to Short, and for Short to have made inquiry of him concerning the trust company and Bell, he being from Pittsburgh. It would be singular if these most likely things did not happen. The three committeemen say, as Short says, that they did not consider the risk until the next morning after Short met Zwinggi. But the following sequential events, all well established, are persuasive that the committee approved the risk before Short went to meet Zwinggi, and in doing so, that they relied on their own records and the set of credentials given by Zwinggi to Campbell. A notation by the committee "O. K. for fifty thousand addl. 2-15-24" in the Commercial's record bears witness that the reinsurance was approved Friday, February 15th. Zwinggi left New York Friday night, February 15th, right after his meeting with Short, and he arrived home the next morning. Short telephoned the proposition to Mr. Vreeland of the Fidelity the morning of the 16th (Saturday), saying, according to Vreeland, "I was over and had lunch yesterday in New York with Mr. Zwinggi," and that "Zwinggi had to get back to Pittsburgh last night," and "to wire Zwinggi, if I wanted any reinsurance, to Pittsburgh." On the morning of the 16th the Fidelity wired acceptance to Zwinggi at Pittsburgh. And there is this pertinent inquiry. If Short did not carry the news to Zwinggi on the evening of Friday, February 15th, when and how did he inform him that his company would take $50,000 reinsurance, for he did not again see Zwinggi, yet, twelve days later, and as a matter of course, his company executed the reinsurance.

Undoubtedly, Zwinggi and Short talked shop when they met, but Short's testimony that Zwinggi fraudulently misrepresented any feature of the risk, is far from satisfying. Reinsurance is routine business; it is co-operative and reciprocal among surety companies. Handled daily in large volume and somewhat promiscuously, three-quarters of it over the telephone and the rest personally, by wire or post, and accepted or refused with the facility and some of the stability of a stock exchange, the trained operator looks chiefly to his company's "board sheet," the financial record of the depository, for guidance (the Commercial had reports on over five thousand banks), and participates in the joint venture, if the facilities of his company—ten per cent. of capital and surplus—warrant taking the risk; or rejects it if the board sheet dictates that course. The integrity of the major insurer is, of course, a voucher, but the ultimate guide is his own record of the depository seeking insurance. As an instance: At the time of the reinsurance the Commercial had a small line on the trust company and in November following it wrote another $80,000 depository bond obtained by Campbell, its Pittsburgh agent, who knew the local situation as Zwinggi knew it, relying on its board sheet, made up in part by a report of the trust company and of Bell accompanying the application for the bond, identical with Zwinggi's credentials. Whatever the shop talk was, it is obvious from Short's own testimony that any representations by Zwinggi as to the solvency and good management of the trust company or as to Bell's worth, were expositive of his credentials, were referable to them and were the expression of an honest opinion based upon them; and Short so understood, so did his committee. An opinion or belief which, if honestly made, and founded upon what appeared to be reasonable and certain ground, is not actionable. *Cowley* v. *Smyth, 46 N. J. Law 380; Henn* v. *Metropolitan Life Insurance Co., 67 N. J. Law 310.* Short's testimony of representation extra the credentials, finds no support in the circumstances and its disingenuousness approaches invention. The evidence shows how, by subtle suggestion to a mind not unwilling, the charges

of fraud were cultivated; how the credentials were the ground-work for representation imputed to Zwinggi; how Short's impressions became convictions, and his testimony but a reflection of his state of mind, not of his memory. Short left the Commercial for Florida three years before the hearing. He had handled thousands of similar cases. When the law suits were started, the Newark attorney of the Commercial (not present counsel) telegraphed him and his reply indicates a meager and dubious recollection. Without consulting him the lawyer sent him an affidavit and he swore to it as prepared, that Zwinggi represented the trust company to be "solvent and in a sound financial condition" and that Bell was "a man of large financial means and worth considerably more than the penal sum of the bond" and that Zwinggi had *concealed* the fact that the bond was a renewal. That affidavit was for use in the law court on a motion for leave to file supplemental answers. The motion denied, and the attorney anxious to move this court, the affidavit to the bill was remodeled, a year after the first one, in which Short swears that Zwinggi represented that the trust company "was *highly* solvent, *well-managed* and in sound financial condition" and that Bell was "a man of large financial means and worth more than $1,400,000 and that his *resources were as high as $10,000,000 or $11,000,000;*" and that Zwinggi stated that *"the bond was an original bond."* (The italics marks the variation.) That the variations were not accidental is emphasized by the transformation of the charge of concealment into a positive representation that the bond was a new one. At the hearing Short failed to support the averments of representation as to Bell's worth, but instead asserted, as already pointed out, that Zwinggi represented that Bell was *reputed* to be worth in the neighborhood of $11,000,000 or $12,000,000, and that that representation was predicated upon Bell's statement which Zwinggi showed him. And he waivered when it came to testifying that Zwinggi represented the bond to be a new one; this testimony was haltingly given, with conflicting modifications and plainly with mental reservations. The charge of false representations is not sustained.

The bill further charges that the Southern (meaning Zwinggi) knew and wilfully, fraudulently and maliciously concealed from the complainants knowledge of the facts that:

(a) The said surety bond entered into by the complainants and Carnegie Trust Company was not an original bond, but was a renewal;

(b) Several of the reinsurers on the bond of which the said surety bond was a renewal had refused to participate in the reinsurance on the said surety bond, and demanded a release of their liability from the prior reinsurance;

(c) At least one of such reinsurers had theretofore stated to the defendant that Carnegie Trust Company was improperly and irregularly managed;

(d) The defendant did not intend to carry more than $100,000 liability at its own risk on the said surety bond;

(e) There had been an investigation conducted by the auditor-general of the Commonwealth of Pennsylvania, commonly called the Kephart investigation, which disclosed irregularities in the management of the Carnegie Trust Company and which resulted in the indictment of Harmon M. Kephart, state treasurer of Pennsylvania, for making false reports of his accounts, and his conviction thereof upon a plea of *nolo contendere,* and also the payment under compulsion by Carnegie Trust Company in December, 1922, to the Commonwealth of Pennsylvania of $15,049.24, as interest on money of the commonwealth, of which Carnegie Trust Company wrongfully had the use of as a result of the irregularities between the said Bell and Kephart;

(f) The reason the said surety bond was reduced from $1,400,000 to $1,000,000 was because some of the proposed reinsurers refused to participate in reinsurance on account of irregularities in the management of Carnegie Trust Company.

The question is: Was there a *fraudulent* concealment? Mere non-disclosure, unless coupled with bad faith, is not fraudulent concealment. When the trust company failed in April, 1925, it was then for the first time discovered that Bell had for years corruptly misused its funds, and he was

later imprisoned. Up until the failure, the trust company was locally regarded as a flourishing, well-managed and sound institution; its published statements showed a constant increase in deposits and profits; it regularly made quarterly and annual departmental reports of its condition and was periodically examined by the state authorities, whose vise confirmed public confidence. And more, it was not closed for insolvency, and insolvency was not discovered until after a chronic failure to keep up its daily cash reserve moved the state banking department to intervene. As to Bell: Until the crash came he was looked upon as one of the leading citizens of Pittsburgh, in money worth, character, business integrity and civic and religious activities; and at the time of the reinsurance his reputation was at its pinnacle. He was president of six banks and director in a dozen corporations; a churchman, president of the local maternity hospital and president of the county workhouse. The R. G. Dun Agency said of him: "He is mentioned as a millionaire several times over, reported to handle his financial and business affairs in a capable manner, regarded wth confidence and reported prompt in his settlements." The Jones Mercantile Agency said of him: "He bears an excellent reputation," and that he is considered "one of the wealthiest men of this section." His credit with other bankers was unlimited, according to an official of the banking department. The disclosures of the Kephart investigation in 1922 seem not to have disturbed public faith in the trust company nor in Bell. Public confidence in them was as firm after as before. The pertinent disclosure was that from 1918 to 1921 checks of the treasurer of Allegheny county drawn on the trust company to the order of the state treasurer, Kephart, for taxes due the state were withheld from deposit and were exchanged by him with Bell for trust company checks on its account in the Colonial Trust Company of which Bell was also president. These checks were signed by Bell as president, were blank in amount and were filled out by the state treasurer and deposited at his convenience. Bell and Kephart gave the investigating committee artful explanations; and as Bell left

the stand he was "vindicated" by the auditor-general (he and the attorney-general were the committee) ; the committee's report was drawn with circumspection; the trust company paid interest on the money withheld and Kephart was convicted of bad bookkeeping and fined. The Philadelphia North American featured the investigation, but it was discounted as a political attack upon Bell and his power and glory remained undiminished. In the public mind and in financial and official circles, the trust company was not looked upon as involved; intercourse with other banks and the clearing house continued normal and its outward aspect was that of a healthy and safe institution. The state banking department was unsuspecting and made no special examination. The Southern knew in a general way of the juggling of state funds by Bell and the state treasurer, and so did Zwinggi and unquestionably so did the large and many financial interests which continued their confidence in him and the trust company; bonding companies continued to insure its deposits. The National Surety Company, the largest of its kind in the world, bonded the trust company for $150,000 as late as February 12th, 1925, and continued to bond Bell's other banks and companies. And Campbell, the Commercial's general agent in Pittsburgh, who must have known in the same general way that Zwinggi knew, of the Kephart disclosures and of the unblemished and uninterrupted high regard in which the trust company and Bell was held, had no misgivings, for he bonded the trust company with the Commercial after the notoriety; Bell's misdeeds were three years past and the Kephart investigation two, when Zwinggi was reminded of them, while canvassing for the reinsurance, by the president of one of the reinsurers on the old bond, who showed him a copy of a letter he had written in 1922, to the president of the Southern calling his attention to the Philadelphia newspaper publication of them. The informing president had no other information and no intimacy with the merits of the risk, but he had a lurking suspicion, was distrustful and refused to reinsure the new bond. Zwinggi, who knew the current public esteem of Bell and the trust company, thought

him too sensitive and over-cautious. Hindsight proves he was not. But we are concerned with the trust company's and Bell's standing when the reinsurance was effected, fourteen months before their downfall, and as of then, with the assuring atmosphere of public confidence in the institution as a background, the absolute good faith of Zwinggi and his company cannot be reasonably challenged. Undertaking the major risk and retaining $100,000 of the liability stands as a guarantee. There was no motive or urge to conceal. The major risk was entirely voluntary; the old four-year $1,400,000 bond had expired and was discharged, and Zwinggi's ultimate orders were to write the new one only, if he had others who would participate to reduce the load to his company's capacity, $100,000 and not otherwise. He solicited thirty or more. Five of the old reinsurers declined reinsurance on the new bond; one, because its line on the trust company was full; two accepted and then withdrew, though the Pittsburgh general agent of one of them, who knew the local situation, thought the risk a good piece of business; to a fourth the risk did not appeal because of the large amount of demand deposits carried by the trust company, and the fifth was the company which refused because of the Kephart disclosures. One of the companies had been "hollering" to get off the old bond; evidently not because of the risk, but because of the amount it was carrying, for it became a reinsurer of the new bond, though for a much reduced sum. Zwinggi was indiscriminate; his sole purpose was to sell reinsurance in the open market to anyone who cared to buy. Reinsurance is bought and sold like any other commodity and the market varies daily. He as often succeeded as he was denied, and denied for reasons unrelated to the merits of the risk; each management had its own policies. Declinations had a variety of reasons. During the previous four years many of the companies had suffered severe losses in bank failures in the west and declined for that reason; some were discontinuing, others were retrenching. Some refused because their lines were full and others just refused. A refusal was not a reflection. Not revealing was not concealing. And so

the trade understood and the complainants understood. The disclosures of the Kephart investigation, which in the light of future events were of sinister significance, had faded away, and to have revived what had become innocuous would have seemed at the time of the reinsurance but hurtful gossip. Silence as to it and non-disclosure that reinsurance had in some instances been declined were not fraudulent concealments. Nor was the failure to broadcast the reason for writing the new bond for $1,100,000 instead of $1,400,0000 as first proposed. Sufficient reinsurance could not be obtained to warrant the latter figure, but there is no proof that the lack was due to a conscious material cause. The complainants knew of the change and remained and its curiosity was not sufficiently aroused to inquire.

As to the bond: It was not a renewal of the same obligation. The old obligation had been satisfied and liability was at an end a month and a half before, when the out-going county treasurer paid over to the incoming treasurer the balance in his hands as required by the bond. With the new bond began a new risk to insure the funds of a new county treasurer. There was a new resolution by the county designating the trust company as depository of its funds during the term of the new treasurer and a new application for a new bond seeking a new engagement. The insurance field had again to be canvassed for reinsurance; reinsurers knew that the requirement for depository insurance on the same fund was constant; that the major bond was periodic; that successive insurance had to be written; that sometimes it was written by the same and at other times by another surety company; that reinsurance had to be obtained and that it was promiscuously solicited. Here the major bondsman simply took on the risk a second time with the co-operation of the reinsurers. The bond was as original as if another company had taken on the risk for the new term. Zwinggi told Campbell of the first bond and the reason for the new one and it made not the slightest impression upon him. It was not through inadvertence or a desire to conceal that he did not mention it in the conversation with Short; he did not think of it as an incident calling

for a statement and the practice of the trade sustains him. Faith in the sincerity of the complainants' now vigorous protest, that had they known they would not have reinsured without inquiring and that they always inquire if it is new or original insurance, is shaken by what actually occurred in the present case. When Short telephoned to Vreeland of the Fidelity, offering the reinsurance, he made no mention, nor did Vreeland make inquiry, whether the bond was a new risk or a renewal. Ignoring at that time what is now so strenuously claimed as a prime factor, indicates that inquiry was not the practice and is significant that it was then regarded as of no concern or consequence. In fact, the whole trend of the evidence leaves the impression of immateriality of Zwinggi's alleged representations or concealments until the disaster and that they then became progressively important as the efforts to evade a just responsibility advanced.

The defense of concealment of the disclosures of the Kephart investigation was before the United States circuit court of appeals (Eighth Circuit) in *General Reinsurance Co.* v. *Southern Surety Co., 27 Fed. Rep. (2d ed.) 265,* in suits against four of the reinsurers on the present bond. Judge Booth's opinion, concurred in by Judge Sanborn and Judge Davis, because of its pertinency, is quoted at length. He says:

"The second broad question, and the most important one, which arises under the assignments of error is, whether the surety company in obtaining the reinsurance contract from the Independence company was guilty of wrongful and fraudulent concealment of material facts.

"Generally speaking, the same principles of law as to false representations and concealments govern in reinsurance as in original insurance. *24 Am. & Eng. Encyc. L. 261; 33 C. J. § 723 p. 49; Sun Mutual Insurance Co.* v. *Ocean Insurance Co., 107 U. S. 485, 510; Phoenix Insurance Co.* v. *Erie Trans. Co., 117 U. S. 312, 323.*

"The strictest good faith is required on the part of one seeking original insurance, and also on the part of one seeking reinsurance. The duty exists on the part of each to

disclose his knowledge of all material facts. *33 C. J. supra;
7 Michie's Encyc. of U. S. Rep. 155, 156.* The cases having
to do with original insurance are therefore of value in reinsurance cases.

"In the leading case of *Daniels v. Hudson River Insurance
Co., 12 Cush. (Mass.) 416, 425,* the court said:

" 'The terms "misrepresentation" and "concealment" have
a known and definite meaning in the law of insurance; and
it is that meaning and sense, in which we are to presume
the parties intended to use them in their contract of insurance, unless there is something to indicate a different intent.
"Misrepresentation" is the statement of something as fact,
which is untrue in fact, and which the assured states, knowing
it to be not true, with an intent to deceive the underwriter,
or which he states positively as true, without knowing it to
be true, and which has a tendency to mislead, such fact in
either case being material to the risk. "Concealment" is
designed and intentional withholding of any fact material
to the risk, which the assured in honesty and good faith,
ought to communicate to the underwriter; mere silence on
the part of the assured, especially as to some matter of fact
which he does not consider it important for the underwriter
to know, is not to be considered as such concealment.'

"In *Johnson v. Insurance Co., 93 Wis. 223, 228; 67 N. W.
Rep. 416,* the court said:

" 'Where a policy is issued without any application by the
assured, and without any question being put to him as to
matters material to the risk, and it contains a clause that it
shall be void if any fact material to the risk is concealed by
the insured, it will not be invalidated by the fact that the
assured did not disclose such material facts, if he did not
intentionally or fraudulently conceal them. *Woods, Ins.,
388; Van Kirk v. Insurance Co., 79 Wis. 627; 48 N. W.
Rep. 798; Alkan v. Insurance Co., 53 Wis. 136; 10 N. W.
Rep. 91; Dunbar v. Insurance Co., 72 Wis. 500; 40 N.
W. Rep. 386.*'

"To the same effect see *Clark v. Insurance Co., 40 N. H.
333; Continental Insurance Co. v. Ford, 140 Ky. 406; 131*

S. W. Rep. 189; Connecticut Fire Insurance Co. v. Colorado, &c., Co., 50 Colo. 424; 116 Pac. Rep. 154.

"In 2 Cooley's Briefs on Insurance 1206, the rule is stated: 'The duty thus imposed on the applicant for insurance to disclose facts relating to the risk is, of course, limited to the disclosure of facts known to him. He cannot be expected to disclose facts of which he is ignorant'—citing numerous cases.

"That the pivotal test is good faith is supported by the following cases: Union Mutual Life Insurance Co. v. Wilkinson, 13 Wall. 222, 230; Moulor v. American Life Insurance Co., 111 U. S. 335, 345; Stewart v. Wyoming Ranch Co., 128 U. S. 383, 388; Miller v. Maryland Casualty Co., 193 Fed. Rep. 343; Mutual Life Insurance Co. v. Hurni Packing Co., 260 Fed. Rep. 661 (C. C. A. 8). The same test is applied in actions for deceit. Fidelity and Deposit Co. v. Drovers' State Bank, 15 Fed. Rep. (2d ed.) 366 (C. C. A. 8); Pittsburgh L. and T. Co. v. Northern Central Life Insurance Co., 148 Fed. Rep. 674.

"Applying the foregoing principles to the facts as outlined above, we are of the opinion that there was no substantial eivdence upon which to base a verdict of fraudulent concealment of material facts. It is, of course, conceded that if the trust company or Bell was insolvent at the time of the making of the contract of reinsurance in February, 1924, or if it were true that Bell had been guilty of mismanagement and misuse of the public funds and falsification of the books of the trust company in 1922, such facts and each of them would be material to the risk under the reinsurance contract. It must be further conceded that if such facts were known to the surety company and were concealed from the reinsuring company, a valid defense would exist in its favor. There was, however, no evidence that such facts or any of them were known to the surety company. The test is to be made as of the time of making the reinsurance contract.

"At that time the financial condition of the trust company as shown by its statement was sound. It was doing a large and lucrative business. Its reputation where it was doing

business was good. Mr. Bell's financial standing was thought. to be excellent. The mercantile reports on him were highly favorable. The only thing shown by the record which in any degree tends to offset all this is the knowledge by the surety company that some eighteen months prior there had been an investigation by state authorities touching certain alleged mismanagement of state funds by the state treasurer in company with Bell. This report had been investigated by the surety company, and the result of the investigation was such that the matter was dismissed from further consideration, and now in February, 1924, the surety company was about to become itself surety on a new bond of the trust company for $1,100,000. All of the facts when considered together, we think fail to furnish any substantial evidence of fraudulent concealment.

"But it is contended that when Mr. Tompkins, in February, 1924, told Mr. Zwinggi, the agent of the surety company, about the letter which he [Tompkins] had written Mr. Cobb some eighteen months prior, relative to Mr. Bell and the state treasurer, this constituted notice of facts sufficient to put the surety company upon inquiry, and it then became the duty of the surety company to make an investigation; and if such investigation had been made, the surety company would have learned that both the trust company and Bell were insolvent; that the surety company thus became charged with knowledge of the insolvency of both the trust company and Bell; and being thus charged with that knowledge, it was guilty of fraudulent concealment in not disclosing it to the defendant.

"The argument does not appear to us to be sound. In the final analysis it bases one presumption upon another presumption. The first presumption is that if the surety company had investigated it would have obtained knowledge of the insolvency of the trust company and of Bell. The second presumption is that if the surety company failed to disclose such knowledge it would be guilty of fraudulent concealment. The second presumption, viz., of fraudulent concealment, is thus based upon the first presumption, of knowledge. But a presumption in order to be valid must be based upon facts,

not upon another presumption. *9 Encyc. of Evid. 880; United States* v. *Ross, 92 U. S. 281; Manning* v. *Insurance Co., 100 U. S. 693, 698; United States* v. *Carr, 132 U. S. 644, 653; Looney* v. *Metropolitan Railroad Co., 200 U. S. 480, 488; Cunard Steamship Co.* v. *Kelley, 126 Fed. Rep. 610, 615; Uhlman* v. *Brewing Co., 53 Fed. Rep. 485; United States F. & G. Co.* v. *Bank, 145 Fed. Rep. 273, 279 (C. C. A. 8); Vernon* v. *United States, 146 Fed. Rep. 121 (C. C. A. 8); Missouri, K. & T. Railway* v. *Foreman, 174 Fed. Rep. 377, 383 (C. C. A. 8); Smith* v. *Pennsylvania Railroad Co., 239 Fed. Rep. 103; Ringrose* v. *Sloane, 266 Fed. Rep. 402; Atchison, T. & S. F. Railway Co.* v. *De Sedillo, 219 Fed. Rep. 686, 689 (C. C. A. 8); Wagner* v. *United States, 8 Fed. Rep. (2d ed.) 581, 586 (C. C. A. 8); In re Elias, 240 Fed. Rep. 448; Keen* v. *United States, 11 Fed. Rep. (2d ed.) 260 (C. C. A. 8); Niederluecke* v. *United States, 21 Fed. Rep. (2d ed.) 551 (C. C. A. 8).*

"Furthermore, we do not think that the statement of Tompkins to Zwinggi was sufficient to put the surety company upon inquiry. That statement did not relate to a present situation, but to Tompkins' letter eighteen months old, about a prior situation; and that situation which he had called attention to eighteen months before, had been investigated at that time and dismissed from further consideration. There was nothing in the situation as it existed in February, 1924, that would incite the surety company to a new investigation.

"It is further contended that a showing of fraudulent concealment was not necessary to constitute a defense, but that it was sufficient to show a mere non-disclosure of material facts which might have been known by the surety company. The reply to this contention is two-fold; first, the answer of defendant setting up its defense expressly charges that the surety company, was at the time in 'possession of the facts,' and 'fraudulently and intentionally concealed said facts from the defendant, well knowing that if such facts had been disclosed the defendant would have declined to reinsure any part of said risk, and intending thereby to deceive the defend-

ant and induce it to participate in said risk.' This plainly was a defense of fraudulent concealment; and not of mere non-disclosure. Secondly, we think that it was indispensible to a valid defense to show either intentional concealment of known material facts, or bad faith in refusing to ascertain such facts.

"It is true that many of the older cases, especially those relating to marine insurance, support the doctrine contended for by plaintiff in error. But we think the more modern doctrine, especially as related to classes of insurance other than marine, makes good faith on the part of the insured a determining factor, except in those cases where specific questions have been asked and answered. An exhaustive discussion of the change from the old rule in marine insurance to the modern rule in other classes of insurance, together with the reasons underlying the change, will be found in an opinion by present Chief-Justice Taft, then circuit judge, in the case of *Pennsylvania Mutual, &c., Insurance Co.* v. *Mechanics, &c., Co., 72 Fed. Rep. 413,* a life insurance case. He sums up his discussion in the following words:

" '* * * we think the modern tendency, even of Massachusetts decisions, is to require that a non-disclosure of a fact not inquired about shall be fraudulent, before vitiating the policy; and, as already stated, this view is founded on the better reason. The subject is by no means as clear, upon the authorities, as could be wished, and the text writers find much difficulty in reconciling the cases.'

"In *Elliott on Insurance* the author states as follows (page 81):

" 'While the decisions are not uniform, there is high authority for the view that under modern conditions the concealment of a material fact through inadvertence or mistake and without fraudulent intent, will not invalidate a contract of insurance. This tendency also appears by the enactment of statutes providing that false representations shall not invalidate the contract unless they increase the risk or are fraudulently made.'

"See, also, *Northwestern Steamship Co.* v. *Maritime Insur-*

ance Co., 161 Fed. Rep. 166, 178; Keatley v. Grand Fraternity, 198 Fed. Rep. 264; El Dia Insurance Co. v. Sinclair, 228 Fed. Rep. 833, 839, 840; National Bank of Ashville v. Fdelily and Casually Company of New York, 89 Fed. Rep. 819; Collins v. Iowa Manufacturers' Insurance Co., 184 Iowa 747; 169 N. W. Rep. 199; Hall v. Peoples Mutual Fire Insurance Co., 6 Gray (Mass.) 185; Brunswick-Balke-Collender Co. v. Northern Assurance Co., 142 Mich. 29; 105 N. W. Rep. 76; Boggs & Leather v. American Insurance Co., 30 Mo. 63.

"It would serve no useful purpose, even if time and space would permit, for us to review the large number of cases cited by plaintiff in error. Leaving out of consideration marine insurance cases, it is sufficient to say that in our judgment the best considered cases fall into one of the following classes: 1. Where insured, having actual knowledge of material facts, has intentionally failed to disclose them truthfully. 2. Where insured, though not having actual knowledge of material facts, yet has intentionally, and in bath faith, refused to become acquainted with the facts. In the instant case we think there was no substantial evidence showing either intentional concealment of known material facts or bad faith in refusing to ascertain such facts."

The prayer of the bill is denied.

The Southern counter-claims for the reinsurance. The answer is that it is not entitled to recover because it defaulted in a condition upon which the reinsurance was written, that:

"The amount of liability retained by the reinsured [defendant] at its own risk on principal [trust company] while their agreement remains in force shall in no event be less than one hundred and fifty thousand dollars ($150,000)."

The first specification of the defense is that the Southern carried a risk of only $100,000 during a part of the year 1924, from August 20th to January, 1925. The Southern retained a $100,000 liability on the $1,100,000 bond and at the time was liable on a bond for $125,000 to the Allegheny County Home for a trust company deposit, upon which its net liability was $75,000; it had reinsured for $50,000.

That bond was written August 20th, 1920, and the condition reads:

"Whereas, the above bounden Carnegie Trust Company has been chosen depository for the said Allegheny County Home, of which Joseph G. Armstrong is treasurer, and by reason thereof will receive into its hands divers sums of money, goods and chattels and other things the property of the said Allegheny County Home.

"Now, the condition of this obligation is such, that if the said Carnegie Trust Company, its successors or assigns, at the expiration of the period for which it has been designated as depository, or at any time during such period upon request to it made shall make and give unto such auditor or auditors as shall be appointed by the said Allegenhy County Home, a just and true account of all such said sum or sums of money, goods, chattels and other things that have come into its hands, charge or possession as depository of the said Allegheny County Home aforesaid and shall and do, pay and deliver over to its successors or any other person or corporation, duly authorized to receive the same, all such balances or sums of money, goods and chattels and other things which shall appear to be in its hands and due from it to the said Allegheny County Home or Joseph H. Armstrong, its treasurer, without any fraud or further delay, then this obligation is to be void, otherwise it is to remain in full force and virtue."

At the annual meetings of the home held in January of 1921, 1922, 1923 and 1924, the trust company was by resolution redesignated as depository, but no new bond was written and there were no written renewals of the one that had been. The Southern, however, annually charged the annual premiums against its Pittsburgh branch and paid to its reinsurers their annual premiums. This carried the premium charges on the bond and the premium payments to the reinsurers to August 20th, 1925. The parties to the bond treated the yearly designations as extensions of the period mentioned in the bond, and the bond as a continuing obligation so long as the trust company should be designated; so did the reinsurers on the bond and the Southern accounting card records the term of the bond as indefinite. These facts testify, as one voice, to the binding force of the bond and the Southern was estopped by its course of conduct from denying liability. It is upon the following circumstances that an hiatus in the liability is based: In January, 1925, at the request of the Southern and by resoluton of the home, the $125,000 bond

was exchanged for one of $75,000 and the Southern rebated the unearned premium on the old bond to its Pittsburgh branch and charged it with the premium on the new one and accordingly readjusted the premium with its reinsurers. Due to an error of an employe in the Pittsburgh branch, who advised the home office that the old bond was canceled as of August 20th, 1924, and the new one written as of that date, the entire premium for the year, August, 1924, to August, 1925, on the $125,000 bond was rebated and the readjustment with the reinsurer was made on that basis, but upon discovery, the error was corrected and the adjustment was made as of January, 1925. That is all there is to that. The fact that the trust company paid the Pittsburgh branch the annual premiums irregularly is irrelevant to the claim of non-continuity of the risk. The last payment was in December, 1923, which carried the premium to August 20th, 1924, and the earned premium on the old bond, and that on the new one stood as a charge upon the books of the Pittsburgh branch when the trust company failed in April, 1925. It was a credit extended by the branch, to which it stood charged by the home office, and was as potent against the Southern as if the premium had, in fact, been paid to the branch. A further contention of an hiatus is that the Southern's liability on the $125,000 bond came to an end with the expiration of the last of the four yearly terms of Joseph C. Armstrong, mentioned in the bond as treasurer of the home, and upon the election of John B. Foster as his successor, in January, 1924, and that from then until the giving of the $75,000 bond in January, 1925, the Southern's promised liability of $150,000 "risk on principal" was but $100,000. This is not tenable. The term of the $125,000 bond was not coincident with the term of Armstrong and its continuity was not contingent upon the personnel of the treasurer, for when Foster was elected the trust company was again designated, and at that time its liability on the bond was current. The risk continued from designation to designation, irrespective of the term of the treasurer.

The other specification of defense is that the $75,000 bond was not a risk for that sum because it contained this provision:

"Fourth. The surety shall not be liable for a greater proportion of the amount on deposit at the time of default hereunder, after deducting therefrom the value of all collateral delivered by the principal to or for the use of the obligee to secure such deposit, than the amount of this bond bears to the aggregate amount of all valid and enforceable bonds, indemnity and collateral (other than collateral delivered by the principal as aforesaid) held by the obligee at the time of such default and liable therefor."

The provision is part of the printed form of the bond. It was not known by the Southern that the Home had demanded of the trust company additional security for an extraordinary deposit of $300,000, the proceeds of the sale of bonds, and that $300,000 of Carnegie Coal Company bonds were temporarily furnished until a surety bond could be substituted. The Home held the bonds when the trust company failed; what they were worth, if anything, does not appear in the proofs. The circuit court of appeals in the *General Reinsurance Company Case, supra,* disposed of this defense, which is adopted, in these few words:

"* * * The contention of the plaintiff in error that risk of loss under the $75,000 bond was reduced below the requisite amount by reason of the two provisions above mentioned in the bond is, we think, without merit. The amount of deposits which the obligee in the bond might make with the trust company was not subject to the control of the surety company; so that it was quite possible for the obligee to make at any time deposits with the trust company in such an amount that there would be liability under the $75,000 bond to the full amount, notwithstanding the collateral and the other bond. It was the taking of the risk of such liability, and not the certainty that such liability would exist, that constituted the performance of its contract by the surety company. The provision of the reinsurance contract relative to the retention by the surety company of risk of loss did not increase or diminish the risk of loss of the reinsuring companies. That provision was in reality simply to furnish evidence of good faith."

The Southern is entitled to recover on its counter-claim.